May it please the Court. My name is Seth Waxman. I represent the defendant, Appellate Greg Reyes. I realize I'm entirely on my own here. My aspiration is to save four or five minutes for rebuttal, but I fully understand that's my job. There are many reasons to reverse the conviction in this case, but this morning I'd like to focus on three. First, prosecutorial misconduct, including arguing to the jury a theory the prosecution knew to be false. Second, the post-trial recantation of the only witness who supported that false theory. And third, the government's complete failure to make out its case on materiality. What — excuse me. I just want to make sure that I understand. The argument you're referring to, the closing argument? Yes. The argument to the jury. You're not talking about the entire presentation of the case. Our — as our brief lays out, there are a number of instances of prosecutorial misconduct, but I'm going to be focusing principally on the argument of the false theory that finance was in the dark. Okay. So as to the first two points, which go to intent, the central issue of every single count of this indictment was Mr. Reyes's intent. The prosecution had to prove that when Mr. Reyes signed minutes granting retrospectively priced options to groups of employees, he intended to cause Brocade to file false financial statements. Now, there are many different ways that the prosecution could have sought to prove that critical point, but the theory it chose was that Mr. Reyes used the paperwork to deceive Brocade's finance department, making it impossible for them to prepare proper financial statements. To prove that, it called a single witness from finance, a clerk named Elizabeth Moore, who testified that she herself assumed that the grant minutes had been signed on the dates that showed on their face. And then, over and over and over again, the prosecutor told the jury that Elizabeth Moore's testimony showed that the entire finance department, quote, didn't know anything, and, quote, had no idea that a look-back was going on. That was false, and the prosecution knew it. Among many other things, Robert Bossie, who was Brocade's controller, and thus the man who was responsible for both the company's accounting and for the preparation of its financial statements, had told prosecutors in two immunized interviews, including one conducted at the prosecution's request in the middle of the trial, that, number one, he did know that options were being priced retroactively, that the company's two CFOs also knew, and that he, quote, didn't initially see look-backs as posing any major accounting issues as long as a grant was made within the same quarter, which the proof showed was, in fact, the practice that Brocade followed. Now what finance understood was not some incidental issue in this case. The way the prosecution structured its case from paragraph 24 of the indictment on, it was a central point of dispute on the fundamental element of intent, and the prosecution's forceful advocacy of a point that it knew to be untrue was prejudicial misconduct that demands reversal, and it was not the only misconduct or consequential error at trial, as our briefs explain. There were repeated attacks on Mr. Reyes's counsel, including the infamous look-you-in-the-eye comment and the, quote, carry-out-the-lie comment, and there were other misrepresentations by the prosecutor of evidence on points critical to the defendant's intent. Don't you think the look-in-the-eye comment, unhappy as it was, was essentially mitigated by the Court's intervention? Well, for the reasons that we set forth, the answer, Judge Pollack, is no. I think that what the – this was a comment that was made just before the defense lawyer stood up to test – to argue. What he asked for was an instruction that you have just been told that I am going to stand up and lie to you, as they allege Mr. Reyes did. But the curative instruction did not say that you are not to infer that Mr. Reyes is a liar and that lawyers are different than witnesses, and it was exacerbated, Judge Pollack, by the prosecution's carry-out-the-lie argument, which it made in its rebuttal-closing argument, which implied that the reason that Mr. Marmoreau had engaged an expert, Dr. Gulley, to look at – to examine possible reasons for the stock pricing was in the prosecution's rebuttal argument's words, an effort to, quote, carry out the lie, the lie obviously referring back to the contention that Mr. Reyes lied in the internal investigation and that Mr. Reyes's lawyer was there. Now, if this were the only issue in this case that went to intent, it would be close. I think it's serious, serious misconduct for the prosecutors and – to make those kinds of comments, impugning a defense lawyer, and there are more. There were – this is a case in which the defendant quite properly did not testify. There were repeated incantations by the prosecutor of closing argument, but every defense that was raised is those are lawyer arguments, that's lawyer – that's just lawyers talking, and this was all in the context of the look-you-in-the-eye comment. I don't want to magnify it because I'm just citing it as additional reasons why the prosecutor's false – or articulation of a false theory to the jury couldn't possibly be harmless error. And as I've indicated, that there are two instances that the judge's instruction on look-you-in-the-eye and the judge's instruction on the missing witnesses, that for reasons that we explain in our brief, we think did not eliminate the taint, were erroneous, and actually had the effect of crippling Mr. Reyes's response to this everybody – that finance was in the dark argument. And importantly, after the trial was over – Let me just ask you a question, Mr. Waxman. My impression is that at the time of the trial, nobody in finance knew, and the prosecution said nobody in finance knew, probably both of which were improper statements. And the judge said, you know, if anybody had come to me and asked me about these finance witnesses, I would have immunized the witnesses, but nobody asked. Is that inaccurate? I do think it's inaccurate in a number of respects. The defense wasn't that everyone in finance knew. Well, finance generally knew. But, yes. And there was evidence in the record, documentary evidence in the record, that Mr. Byrd, Mr. – I've gone through the bossy 302s, but there were documents, Exhibit 168 and a number of other documents, that showed that the CFOs and the controller did know, at least at points of time that look-backs were going on, that they advised human resources, which had set up this system, that it was okay within a quarter, and that Mr. Byrd, the CFO, was actually involved himself in arranging these. Now, when Judge Breyer considered the Rule 29 motion in the close of the government's case, he struggled, and you can read this at pages 1641 through 1661, I believe, of the excerpts of record, with whether the government had even satisfied a modicum of evidence to prove that Mr. Reyes, who was not an accountant, and as to whom there was no testimony of any conversation ever in this accounting fraud case with anybody in the finance department or anybody in accounting about accounting for these stock option grants that he was granting, the only argument was prejudicial misconduct that required dismissal, he wrote an opinion, and he said, well, you know, that was a forceful argument, but it's supported by evidence in the record, and the only piece of evidence that he identified, because it's the only one there for the government's side, was Elizabeth Moore's opinion, which was trying to focus on what we need to decide with respect to the prosecutor. And as I understand it, you're not asking us to decide whether or not finance knew or didn't know. Correct. Okay. So you are asking us to decide whether the district court erred in saying that the prosecutor, on the basis of what I have seen in the FBI reports and other things, didn't lie, and that you could have asked for immunity for these people to establish it. Well, first of all, what we're asking for, this is, we're not making a sufficiency argument with respect to Mr. Reyes. Yes, I understand. This is harmless error. The question is whether it was harmless beyond a reasonable doubt. Now, wait. Where is, first of all, where is the error? The error is in propounding to the jury a theory of the case. No, the district court's error. The district court erred in concluding that the error was harmless, that what Ms. Moore thought was not dispositive because it's Mr. Reyes's intent that matters. The problem is that the way that the prosecution structured its case, and I can explain why it had to, was to, on a theory that Mr. Reyes signed these so-called backdated minutes for the purpose of deceiving Mr. Bossie, who was the accountant and financial statement preparer, so that he wouldn't prepare true financial statements. The issue of the, you know, the immunized witnesses also I would like to say is, I think, not quite fairly characterized. These were people, the finance people, were immunized by the government before trial for purposes, the queen for a day immunity, for purposes of their interviews, repeatedly. We tried to talk to them. We tried to ask him to immunize him so that we could get our side of the story out. The government told them he had no authority, and he so held. We didn't thereafter go back in the trial and say, we're asking you to reconsider this, because we had, it wasn't our, first of all, it's not our burden, period. But we certainly, and it's not our burden, to call witnesses who I acknowledge would have offered testimony that was both helpful and harmful to both sides, because we anticipated that the prosecutors would stand up and make a categorical misrepresentation about what the entire finance department knew, based on the proxy of a single stock clerk, and to boot, a stock clerk who, as soon as the trial was over, recanted her testimony. She told the prosecutors that she would assert the Fifth Amendment if she were called at Ms. Jensen's trial for reasons, anything related to her prior testimony. And she told witnesses, and we have the declarations in the record, that she had testified, quote, untruthfully, that, in fact, she and everyone else in the finance department knew that brocade had a process in which it looked back and picked favorable prices, that it was done openly, and that no one thought there was anything wrong with it. And in response to that, the prosecution not only did nothing to investigate, although we requested it, and opposed any hearing in front of Judge Breyer, but it warned that if Ms. Moore opened her mouth and now testified inconsistently, she should be prosecuted for perjury. And if a criminal trial is more than just about chalking up convictions and preserving them, the post-trial recantation of the only witness on whom the prosecution relied to rebut the central defense requires a serious response from the prosecutor and from courts. And this court should either dismiss the indictment or, at the least, order a new trial. Now, with respect to the false statement and securities fraud counts, there can be no retrial. With all of the other problems in this prosecution, perhaps the ultimate irony is that the government did not introduce sufficient evidence to support a finding that the hypothetical option expenses that Mr. Reyes supposedly schemed to keep off brocade's financial statements were even material to the company's investors. This is not a case where materiality is at all obvious or intuitive. The government says that its expert came up with testimony that this was a big expense number and it would have transformed brocade's profits into losses. But the same expert admitted that he could not testify that those numbers would have mattered to any investor. The hypothetical option expenses here were an accounting fiction. They had nothing whatsoever to do with brocade's income, with its expenses, with its business prospects in the present or in the future. I mean, I recognize, at least for me, this was not an intuitively obvious point when I first addressed this. But the only thing that an investor, and there was no testimony in the evidence to the contrary, what are these things? What are these expenses? They relate to stock options. What would a businessman, businesswoman, a reasonable investor care about stock options? Well, they would care three things. This was in Mr. Simpson's testimony. They would care how many of them are there outstanding, when can they be exercised, and what price will the company get for the stock when they are exercised. And what's remarkable about this case is that there is no dispute that all of that information was provided in all of these filings under FAS 123, which was in existence at the time. The company was required to report and did report all of that information in the financial statements. If the government wanted to rely on the nondisclosure that they did rely on, this intrinsic value accounting fiction, they had to put on some real proof that that number mattered to a reasonable investor. But in fact, the government's evidence showed exactly the opposite. It showed that they were not interested in accounting artifacts that turned actual profits into hypothetical losses. They called one investor, Steven Catrix, who testified number one, that he himself never invested in or analyzed brocade. He testified that as to the companies he did analyze, he routinely factored those types of expenses out. And remarkably, he confirmed that he had two colleagues, the infamous Jeff and Jerry, who were responsible for investments in brocade, but weren't called by the government. And he testified that they also factored this information out in order to see what is referred to as the company's pro forma statements. Mr. Waxman, is it the fact that certain investors couldn't have cared less? Does that really insulate the asserted conduct of your client from the kind of scrutiny which says, well, maybe this investor didn't, but investors as a category were entitled to know the truth? I have two points to make on that, Judge Pollack. First, with respect to proving the essential element of materiality, particularly given the nature of these hypothetical expenses under this now discredited accounting contrivance, they had to put on some evidence, an expert or somebody who was an analyst with brocade that knew the total mix of information, who would say this would matter, number one. That's materiality and it doesn't go to intent. But in a very direct way, the inconsequence of this accounting artifact does go to intent, because they had to prove, and Judge Breyer struggled with this in those transcript pages that I mentioned to you, struggled with the fact that this is an accounting fraud case. The government didn't call anyone from the finance department or the accounting department who testified, didn't call anyone who testified about any accounting conversation they ever had with Greg Reyes about the options that were dated and granted in this case. And why would a businessman with no accounting background think, in light of the fact that the financial statements did report all the options that were outstanding, what price they would be, could be? Was all of that before the jury? Yes. And so the argument that you've just made with respect to materiality was argued to the jury? It was argued to the jury on both sides. Our argument as to materiality just is. Well, your question is sufficiency, isn't it, on materiality? Sufficiency as to materiality. And Judge Pollack said to you, what difference does it make that somebody didn't care about it, which seems to me that some people did care about it. There were two expert witnesses called. The only one that really matters is the prosecution's expert witness. The prosecution's expert witness said he used a methodology which the prosecutor at closing even acknowledged was flawed. But he said, well, if you really add up the, quote, intrinsic value under my interpretation of examination, he acknowledged that he had no idea whether, given the nature of what that number represented, it would matter to any investor. Our expert and our fact witness both testified that it couldn't matter not just to a investor, but a reasonable investor. Did anybody testify for the prosecution that it did matter or would matter to anybody? The only witness who testified, I'll answer this question in a minute. Quickly, because I think it's a very good cue for the government. Okay. Mr. Catrix, who was the investor from Delaware, the partner of Jeff and Jerry, said that he would always want to know that information, you know, information like that, and that people of interest. You say the information like that is available from the reports. Well, there are two... It's a yes or no answer. It's actually, unfortunately, not a yes or no answer. FAS 123 required the company to disclose in the financial statements the fair value of the options. That was done. There was an accounting opinion known as APB 25 that also required the company to deduct as compensation expenses a fiction known as intrinsic value, which was not done. Okay. Thank you. Thank you. We'll give you two minutes on rebuttal. Good morning, Your Honors. I'm Amber Rosen on behalf of the government. The defendant asked this Court to grant him a new trial, and the overriding question then for this Court is did he receive a fair trial? And the answer to that is yes. He had and continues to have a team of top-notch defense attorneys working on his behalf. He had full disclosure of every scrap of evidence from the government. He had the opportunity to litigate just about every issue imaginable below, and he got detailed, thorough, written opinions by the district court. Defendant received a fair trial, and now he just doesn't like the result of that. I want to first address the defense's claim that the government's statements and closing argument regarding finances knowledge was prejudicial error. The government's theme throughout the case was not that finance didn't know. The government's theme as laid out in the indictment, in the opening statements, and in the closings was that through the fraudulent grant minutes, the defendant showed his intent and his knowledge in trying to hide the fact that he was going to get back and avoid compensation expenses. And if you look at one of the grant minutes themselves, you can see this just in the way that they were done. There is an example of one at the excerpts of record at 2743. Those would not be just looking from the grant minutes. You couldn't take a compensation expense even if you knew that the date for evaluating the options was picked in hindsight, because there's only one date on there, and it represented that the date that he was valuating the options was the date that he granted the options. And, of course, to take a compensation expense, you have to know the actual date that the options were granted, and there was no second date for when that was done. They were fraudulent documents, and they had the entire purpose of them was to conceal the fact that that date for evaluating the options was picked in hindsight. Mr. Rosen, unless I've heard you mistakenly, I understood you to say that it was not the government's theory that the accounting people didn't know. Wasn't that at least stated in closing argument to be an important part of the government's case? Yes. I see it saying our theory is that those people didn't know anything. I didn't mean to suggest that it didn't become a part of the government's case and that the government didn't say that in the rebuttal statement. What I meant to say was that their overall theme throughout the whole case was not that, and that that actually didn't come up even until the rebuttal, and that the overall theme was that there was this intent to deceive through the way in which the grant minutes were done. The government conceived that to the extent the government said finance doesn't know anything, or that Elizabeth Moore said the finance executives didn't know anything, it was mistaken. It was mistaken. Moore testified only about what she knew, and, you know, there was some countervailing evidence in the outside record that at least Bossie had sort of If it was mistaken, don't we then have to find out what the likelihood was that that mistake could have mattered to the jury? Well, I think there's two questions to that. The first is, while it was an overstatement, was it false? And the district court found that it wasn't, saying basically, look, what exactly the finance executives knew, when exactly they knew it, how they reacted to it. It's just not clear from the entire record, and we would agree with that. But even if the district court erred in finding that it wasn't an untrue statement, it was still harmless error. There was certainly no intent. I just want to make sure I understand. Okay. As I understood, it was the defense that finance knew. That was the defense's theory. Yes. That they were the ones who were doing it. Yes. I'm sorry. I may have meant to say finance didn't know. I'm sorry. So the government didn't, this wasn't a central part of their case in chief, but it was a part of the defense. Is that correct? Yes. It was the defense. And then in rebuttal, as part of its response to why the jury shouldn't buy the defense that Reyes was relying on his accounting department. And, of course, the argument had many facets to it, only one of which was the statement that finance didn't know. But what I was going to say about that. Kind of an important facet, wasn't it? I mean, it was part of the whole. There was four hours of closing statement by the government. And this was three sentences that the government made any kind of overstatement with respect to finance's knowledge. What helped me, my understanding was that the defense was interested in showing that the finance people were aware of this enterprise. Correct. And that evidently nothing was said by the finance people to Mr. Reyes about this isn't the way we're supposed to be doing things. That the government took the position of there's nothing to that defense because the finance people didn't know anything. Nobody knew anything except Reyes and Jensen. Well, that was not the whole of the government's response to the defense that the defendant relied on the finance executives. In fact, what the government said in rebuttal with respect to reliance was garbage in, garbage out. In other words, the fact that he's giving them fraudulent documents and not giving them the information from which they could even determine a compensation expense was part of the evidence to show that he didn't rely on them. He wasn't giving them full information. Two, that there was no evidence at trial that anyone told him it was okay to not take a compensation expense. Weren't the finance people making up lists that showed, giving him lists that showed the dates with the lowest value and, you know, telling him which those dates were so that he could pick the lowest dates? No, I don't think the e-mail told him you can pick these different dates, but there was an e-mail about... It gave him the dates for the past valuations with the lowest dates indicated? There was some e-mail to that effect, what exactly it said. I don't recall off the top of my head. And that went to the jury, and the jury had that to consider, which I think is part of the harmlessness argument. First of all, what finance knew really doesn't tell you what Reyes knew. The jury had to find that Reyes knew and had the intent to do it. That's what they found, and there was plenty of evidence to support that. They had evidence that Reyes had told June Weaver it's not illegal if you don't get caught. They had evidence that when Reyes was first confronted in the internal investigation, he said to Craig Martin, I'm not picking dates with hindsight. I didn't do any look-backs. All of this goes to the sufficiency of the evidence. Well, I think it goes in part to the harmlessness, one, in terms of the strength of the argument, that's a factor that's looked at, and in the fact that it's just not that relevant what the finance executives knew when there is evidence that Reyes himself knew, as this Court even found in Goldfield Deep Mines, where the defendant knows that the financial statements are inaccurate. It really doesn't matter that their finance executives may have signed off on those statements. What is the standard, does the government say, is the standard of harmlessness? Assuming one were to say that the prosecution's rebuttal argument was, to use your word, untrue, what standard is one to apply with respect to whether that's harmless? Thank you. I'd like to answer that. It's not the Chapman beyond a reasonable doubt standard. While it's true that the Court has occasionally used that, in the cases where it has, it's because the misconduct implicated a constitutional right. For example, in Bruno v. Russian, the misconduct went to interfering with the defendant's right to counsel, and in Brown v. Borg, it went to a Brady violation, which is a constitutional due process violation. This is just garden-variety claims of prosecutorial misconduct. Well, garden-variety, and the standard, you've told us what you think the standard isn't. Right, I'm going to ask. Doesn't the standard, are you then saying that the standard, the applicable standard would be whether the Court is satisfied that there is a, at least a high degree of probability that this wouldn't have affected the jury? The standard, Your Honor, is whether it's more probable than not that the prosecutor's conduct materially affected the fairness of the trial. And the Court has, this Court has repeatedly laid out that standard in misconduct cases, including, yes. Go ahead. I'm sorry, I didn't mean to. Oh, I was just going to say the Endicott case, the Supreme Court's case in Young, the McCoy case, the Kajian case. So that's the standard of harmless error that we think should be applied in this  Well, I'm still trying to figure out exactly what it is we have to decide. Yes. We're here on direct appeal. It's not up to us to decide whether or not those people knew or not. The question is whether or not, as I understand it, it was misconduct for the prosecutor to say that they didn't know. And that, not that we might decide that they really did know with all we know now, but whether or not there was a lie. Isn't that correct? Well, Your Honor, there's two things. The overriding issue for this Court is did the district court abuse its discretion in denying defendants the motion for new trial? Yeah, I understand.  But I'm trying to parse that. Right. No, I understand. The first question is was there error? That question, in other words, did the government say something false to the jury and did it constitute error? That's the first question. That's reviewed for clear error. The Court's factual finding as to whether that was false and constituted error is a question of clear error. And we think the Court got it right in finding that there wasn't. But even if the Court disagreed with that, the next question is, well, would it be harmless error reviewed for abuse of discretion? And the Court, of course, found that it wasn't harmless error. I guess what is troubling me is do we, are we supposed to decide whether or not what he said was false or whether or not he knew it was false to be misconduct? Oh, I think it has to be a knowingly false statement. Yeah. Which this, I think, I don't think that there was no intent on the prosecutor's part to try to mislead the jury. It was a little error. He was able to speak. That's different from whether he knew it was false. Excuse me? I said that's different from whether he knew it was false, whether he had an intent to mislead the jury. It's true. Is there any question that he knew it was false? Well, I mean, to the extent that Bossie had said, I figured it out, what they were doing. I asked them, and they specifically told me, we're not backdating. But, yeah, he seemed to have figured it out. So technically, if you just take the statement, finance didn't know anything, is that literally true? I mean, I guess you'd have to say to some extent it's not literally true when taken just out of context like that. However, the overall point that the government was making, which was that finance was not told, that the process was not open, that the point of falsifying the grant minutes was to mislead, that was all true. And it was a very disputed question, exactly what the finance executives knew. And that's part of why we feel like that it's harmless. Not only is it not that relevant what the finance executives knew, given Reyes's knowledge, but there was full disclosure by the government of all of the statements of the finance executives. And that clearly distinguishes this case from all of the misconduct cases that the defense is relying on in cases like Kajian. The defense had all this information. They had the ability to call the finance witnesses. The district court found that the witnesses were equally available to both sides. And Judge Reinhardt, as you had said, the district court specifically had said to the defense attorney, boy, you know, if you had asked, if you had wanted to call these witnesses and you had asked me to immunize them, given what you just said in your closing, the court said, quote, I would be very surprised if I wouldn't have ordered the witnesses to testify, particularly since it's braiding material, particularly because it's exculpatory. So they had access to these witnesses and could have called them. In addition to that, they put before the jury their entire defense that the finance executives knew. They put forth the e-mails, including the one that you're talking about. They put, they cross-examined Elizabeth Moore and brought out from her that the finance executives did know that there was often a big time lag between when the grant minutes were signed and when the grants said that they were given, maybe suggesting that they should have known. They brought all this out. And the statements by the prosecutor, as I said, they were not pervasive. This was not throughout the trial. This was a few sentences in closing. As you see it, ultimately, what was it that the jury was to decide in looking at the positions of the two sides? Was it, it would appear that it would be whether or not Mr. Reyes was responsible for this or whether the finance people were doing it. Or is that, what is the relevance of whether somebody in finance may have known or figured it out? What they needed to determine was did Reyes purposely falsify these grant minutes for the purpose of rendering false financial statements? That's what they needed to determine. They didn't need to determine anything about finance because it wasn't a choice. Finance weren't on trial and their knowledge was not an issue for them. The defense tried to make it an issue and say, look, if you think finance knew, we think you should then infer, well, gee, if they knew they should have said to Reyes, you know, you can't do this. And there's no evidence of that. So therefore they must have told him this was okay and then he's just relying on them. That's what they wanted the jury to believe. But as long as the jury believed that Reyes knew, it really, then, you know, the finance executive's knowledge would have just made them complicit and they didn't really, I mean, they could, and they had all of that to weigh. They had the defense's theory to weigh and they clearly rejected it. There certainly was evidence that not only that Reyes had lied and was doing these grant minutes in a fraudulent way, but there was some evidence also about his accounting knowledge and that he was concerned about compensation expenses. For example, he received the Iquanic email which had in it the APB 25 rule. He was concerned when there was a new law pending before Congress that would make all options something you would have to expense. You know, there was a lot of flurry in the offices and efforts to make sure that didn't pass, including lobbying Congress on behalf of that. So he was certainly aware of the issue of compensation expenses. And it's on the 10 page. May I take you back? Yes. Take you back a paragraph? You've described a situation in which the finance people weren't called by other side. When in rebuttal, the prosecutor says, Elizabeth Moore says finance didn't know. Did you need everybody in the finance department to come and tell you that they didn't know? I wonder if I were on a jury whether if the prosecution said that to me, I would think to myself, gee, you know, I guess the government, the prosecution must know what those finance people would have said. I have to think that something I ought to give weight to, even though we didn't hear these people, but the prosecutor obviously must have talked to them. Isn't that a somewhat dangerous kind of thing to have happened? Well, it's not ideal. You know, I would agree with you on that, but I do think you have to view. Not ideal, you said. No, no, no, no. But as the courts recognize, defendants aren't entitled to perfect trials. There's no perfect trials. And sometimes misstatements happen. And I think you also have to think about the fact that. They're entitled to a fair trial. Absolutely. The defense put on lots of countervailing evidence that finance knew. So the jury had that issue before them and they had one side. Your basic position is that it didn't matter whether the accounting knew or not. I think that is part of it. In other words, when they if they found that Reyes knew, it wouldn't matter what the finance executives knew. The defense tried to make that a big issue, as if that should be really relevant. And the jury could have. The jury could find that relevant in determining whether Reyes knew, but they certainly didn't have to. When you say. Yes, excuse me. When you say plenty of evidence that Reyes knew, there's plenty of evidence that Reyes knew that this was a misstatement about the date at which the options were granted. But that doesn't quite meet the question as to whether he knew that this was a forbidden accountant way of accounting and what the implications of that were. And that, I suppose, does go to the defendant's intent. Well, when I say he knew, I meant there was plenty of evidence that Reyes knew the accounting implications of what he was doing and that that's why he was doing it. In addition to that, part of that was the Iquantic email. Part of that was knowing that he was very concerned about compensation expenses and tried to lobby against the bill that was going to make them all Just a minute on materiality and tell me what the government evidence was that this was material. Yes, Your Honor. Before I do, I just wanted to correct one thing that I had said, and that was related to the question you asked about the email that Reyes got concerning the numbers and picking a low date. My, my recollection is that that email came from someone in the HR department, not someone from the finance department. So I wanted to correct that because I think that's significant. But yes, I'll move on to, I'm sorry, materiality. Is that what you wanted to discuss? Yes, please. What was the evidence that this will be your last? It was material. There were five things in the government's case in chief which proved materiality. First, there was the Catrix testimony. He was the investor from Delaware. Yes. And he said, um, non-cash, non-cash expenses were important to him in making investment decisions. He said, it's important to know whether a company's granting in the money stock options because if they're not reporting them correctly, it inflates earnings, um, and could affect the earnings per share. He also said granting in the money stock options, um, could implicate the alignment of interest between the shareholders and the employees. And so that it's important to know. And while he did say, as the defense attorney pointed out, that, um, often analysts factored out non-cash expenses. He also said that that was only sometimes, and that was not always, and that it didn't make it not important to him. So that was one, uh, witness. Secondly, there was McCormick from Fidelity. Fidelity owned about 13% ownership share in Brocade. He was in the proxy department, and he said, we voted our proxy decisions, we voted against in the money stock options, and that those proxy decisions were based on trying to maximize return for investors. So that was more information the jury could use to infer materiality. Then, um, uh, Brocade talked about the stock drop. After, um, Brocade announced on January 6, 2005, that there was an error in its accounting related to compensation expenses, and that it was going to be refiling, was going to be filing restatements, and that it was undergoing an internal investigation, the stock dropped 7.5% upon hearing that news. And this case, this circuit in Talbot, and the second circuit in Blazarian has said, stock drop or stock increase information is something that the jury can use from which to infer materiality, and neither of those cases discussed causation. The last two points are simply the change to earnings. Brocade, according to the government's expert, Garvey, reported earnings in two years when it would have reported losses had it correctly reported the compensation expenses. And the cases basically hold, you know, overstatement of earnings is almost always material, and it doesn't distinguish, those cases don't distinguish between non-cash or cash expenses. And the last one was the intent of management. Ferguson has said intent of management may provide significant evidence of materiality, and the government put on evidence that the management here, Reyes, was trying to conceal the fact that he was hiding these expenses. So on those five pieces of evidence, we think the jury had more than sufficient evidence to find materiality. Thank you. Thank you. The notion that this is harmless because this involved three sentences in rebuttal is a complete mischaracterization of the record in this case. The indictment alleged this concealment. When the prosecutor stood up for the first time, this is on page 20. I don't expect you to see this. This is on page 24 of our 2017 exhibit. We see it. He told you that Elizabeth Moore was very important. This is in his opening closing argument. This is way more than some drive-by theory of the case. Harmlessness in the context of this case and in the context of the government's refusal, the government's obstruction of an investigation of her recantation and threatening her with perjury if she opened her mouth again when her testimony was the only thing in the entire five-week trial that supported the notion that Mr. Bossi and the other people in finance didn't know is simply fantastic. Now, when Judge Reinhart, you asked a question about when Mr. Reyes changed the dates or made the dates on these. Understand that the testimony was that this system for grouping employees together into a quarter or a week or a month and then for reasons of administrative convenience and fairness choosing a low date was not only arranged by the HR Department and finance to which it reported. There was no evidence whatsoever that Mr. Reyes created this, engaged in the multiple changes in the forms, or even suggested what dates should or shouldn't be on the document. These were handed to him and he initialed them. And, Judge Schroeder, this goes to your question, what do we have to prove? You have to prove that he, when he signed his initials next to the sign here, sticky, he intended to perpetrate an accounting fraud in a context in which the only way you can infer that is if you believe, which the government asked you to believe, that the finance department didn't know the company's standard practice which was memorialized in the infamous beer truck memo that was widely available and that there was actually something wrong with the accounting when the under FAS 123, the number of options, the price, etc. On the points on materiality, we will rely on our brief and our response. What about the statement that he was asked about the practice and he said it's not illegal if we don't get caught? This was, the question is the it. This was testimony by June Weaver, who was the human resources person who testified that she had had two to four conversations with Mr. Reyes during her entire tenure. She was the person who decided the look back shouldn't be for a quarter, it should then be for a month and then a week. And when she testified that at one point she had a conversation with him in which he made the comment it's not illegal if you don't get caught. Now this was first of all a woman that Reyes had fired, but in any event she acknowledged that she had no recollection whatsoever about what the comment was in reference to. It was just a comment that she recalled at the very end of her testimony, not in her 302s or anything else, that Mr. Reyes had once said to her in response to something. Thank you. Thank you. Thank you. We will study the record. The case just argued is submitted for decision.
judges: Schroeder, Reinhardt, Pollak